**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
PATRICK BRYANT,

               Plaintiff,

        -against-

KRISTIN STEELE, personally, THOMAS
VERTREES, M.D., personally, DAVID
MARGUILIES, M.D., personally, BRENDA
GARRO, M.D., personally, STONY BROOK
UNIVERSITY MEDICAL CENTER,
THEDDEUS IHENNACHO, M.D., ABID
IQBAL KHAN, M.D., personally, LLOYD
SOOKU, M.D., personally, and BRUNSWICK
HOSPITAL CENTER, INC.

               Defendants.
-----------------------------------------------------------X

**MEMORANDUM OF
DECISION AND ORDER**
13-cv-5234 (ADS)(GRB)

**APPEARANCES:**

**Law Office of Ray Malone, PLLC**
*Attorneys for the Plaintiff*
207 Radio Ave
Miller Place, NY 11764
      By:    Robert James Malone, Esq., Of Counsel

**Touro College Jacob D. Fuchsberg Law Center, Civil Rights Clinic**
*Attorneys for the Plaintiff*
225 Eastview Drive
Central Islip, NY 11722
      By:    William M. Brooks, Esq.
               Michelle K. Caldera, Esq., Of Counsel

**New York State Attorney General's Office**
*Attorneys for the Defendants Kristin Steele, personally; Thomas Vertrees, M.D., personally,*
*David Marguiles, M.D., personally; Brenda Garro, M.D., personally; and Stony Brook*
*University Medical Center*
200 Old County Road, Suite 240
Mineola, NY 11501
      By:    Ralph Pernick, Assistant Attorney General

**Ivone, Devine & Jensen**
*Attorneys for the Defendant Theddeus Ihennacho, M.D., personally and Abid Iqbal Khan, M.D., personally*
2001 Marcus Avenue
Lake Success, NY 11042
      By:    Brian E. Lee, Esq., Of Counsel

**Lewis, Johs, Avallone, Aviles**
*Attorneys for the Defendant Brunswick Hospital Center, Inc.*
425 Broad Hollow Road
Melville, NY 11747
      By:    Greg M. Mondelli, Esq., Of Counsel

**NO APPERANCES:**

*Lloyd Sooku, M.D., personally*

**SPATT, District Judge.**

      This civil rights and medical malpractice action arises out of the involuntary hospitalization of the Plaintiff ("Patrick Bryant") at the Defendants Stony Brook University Medical Center ("Stony Brook") and the Brunswick Hospital Center, Inc. ("Brunswick") in March 2011. Presently pending before the Court are (1) a motion by the Defendants Kristen Steele, Brenda Garro, M.D., and Stony Brook (collectively the "State Defendants") to dismiss the second amended complaint against them for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted and (2) a separate motion by Brunswick to dismiss the original complaint – now, directed at the second amended complaint – against it for failure to state a claim upon which relief can be granted. For the reasons set forth, the motions are granted in part and denied in part.

## I.     BACKGROUND

      Unless otherwise stated, the following facts are drawn from the second amended complaint and construed in a light most favorable to the non-moving party, the Plaintiff.

A.  The Parties

The Plaintiff is a resident of Suffolk County in New York State.

The Defendant Kristen Steele was at all relevant times a member of the Mobile Crisis Unit operated by the New York State Office of Mental Health in Suffolk County (the "OMH").

The Defendant Thomas Vertrees, M.D. was at all relevant times a designee of the Director of Community Services in Suffolk County.

The Defendant David Marguiles, M.D. was at all relevant times a designee of the Director of Community Services in Suffolk County.

The Defendant Brenda Garro, M.D. was at all relevant times a physician employed by Stony Brook.

Stony Brook is operated by the State of New York, and, in turn, operates a Comprehensive Psychiatric Emergency Program (the "CPEP").

The Defendant Theddeus Ihennacho, M.D. was at all relevant times a physician employed by the Defendant Brunswick Hospital Center, Inc. which is licensed by the OMH to provide psychiatric services.

The Defendant Abid Iqbal Khan, M.D. was at all relevant times a physician employed by Brunswick.

Finally, the Defendant Lloyd Sookhu, M.D. was at all relevant times a physician employed by Brunswick.

B.  Procedural History

In late 2010 and into the early part of 2011, the Plaintiff allegedly received several telephone calls from unidentified persons that he perceived to be threatening.  On February 7,

2011, the Plaintiff sought assistance from the Suffolk County Police Department to investigate these calls.

Between March 14, 2011 and March 21, 2011, the Plaintiff twice contacted the Internal Affairs Division of the Suffolk County Police Department to complain about the lack of progress of police work in connection with the allegedly threatening telephone calls. However, the Suffolk County Police perceived the Plaintiff's reports to them and his behavior as manifestations of mental illness.

At some point, the police contacted the Mobile Crisis Unit operated by the OMH to evaluate the Plaintiff. Part of the function of the Mobile Crisis Unit is to promptly assess the need for emergency mental health evaluations for individuals deemed to be in crisis.

On March 21, 2011, co-defendant Steele, a social worker who was part of the Mobile Crisis Unit, accompanied by two Suffolk County Police officers, approached the Plaintiff's home. The Plaintiff met them outside his home and the police engaged the Plaintiff in discussion.

During the conversation with the police, the Plaintiff mentioned that he had old hunting rifles in his home. The rifles were collector's items: a Marlin; a World War II British rifle; a World War I Eddystone; and a 1930's Spanish Mauser. The rifles were kept in a glass display in the Plaintiff's bedroom, were not loaded, and some had never been used by the Plaintiff. The Plaintiff kept the rifles in a display cabinet as collector's items because he no longer hunted deer as a hobby that he once enjoyed with his friends during the 1980s. According to the Plaintiff, he had not used or intended to use the rifles since 1989 when he was issued his last hunting permit.

When the police asked the Plaintiff for more information about the rifles, he explained that he had four hunting rifles which he had not used in twenty-three years and had no intentions

of using them. The Plaintiff further stated to the police that the rifles were dusty and therefore inoperable in their current condition. Shortly thereafter, the conversation ended, the police and social workers permitted the Plaintiff to return to his home.

The Plaintiff alleges that, notwithstanding his logical and coherent responses to the questions, Steele determined that the Plaintiff manifested symptoms of mental illness that required psychiatric evaluation.

Steele was never directly responsible for the Plaintiff's treatment prior to or subsequent to March 21, 2011. Steele communicated with the Directors of Community Services Designees, the Defendants Thomas Vertrees, M.D. and David Margulies, M.D. in connection the removal of the Plaintiff from his home pursuant to the provisions of New York Mental Hygiene Law § 9.45. Steele reported to Drs. Vertrees and Margulies that the Plaintiff suffered from a mental illness for which immediate care and treatment in a hospital was appropriate.

The Plaintiff alleges that he never suffered from a mental illness for which immediate care and treatment in a hospital was appropriate and which was likely to result in serious harm to himself or others as defined by Mental Hygiene Law § 9.45. The Plaintiff further alleges that Steele had no basis to believe that the Plaintiff suffered from a mental illness for which immediate care and treatment was appropriate and which was likely to result in serious harm to himself or others as defined by Mental Hygiene Law § 9.45.

Nonetheless, on March 21, 2011, Drs. Vertrees and Margulies authorized the involuntary transport of the Plaintiff to the CPEP operated by Stony Brook pursuant to Mental Hygiene Law § 9.45. The police then seized the Plaintiff at his home and transferred him to the CPEP department at Stony Brook for psychiatric evaluation. The Plaintiff did not resist and left

peacefully with the officers.  However, the Plaintiff did not consent to any psychiatric services.

The officers also seized the Plaintiff's collector's rifles from the display cabinet in his home.

At Stony Brook, the Plaintiff was examined by the Defendant Brenda Garro, M.D. for

"approximately three minutes."  Dr. Garro apparently asked the Plaintiff why the police brought

him to the CPEP.  The Plaintiff then described his attempts to seek police assistance in

connection with the allegedly threatening phone calls and that earlier in the day, he "casually"

mentioned to the police officers the collector's rifles in the display cabinet.  Dr. Garro did not

ask any further questions regarding the rifles, including why the Plaintiff had them, their

condition; or whether they were loaded or in a locked area.

Further, Dr. Garro did not inquire whether the Plaintiff intended to use the guns for any

purpose, including self-protection; whether he intended to harm anyone or himself; or whether he

had any violent thoughts.  In this regard, the Plaintiff claims that he never had any thoughts or

plans to use the rifles.

Following this meeting, Dr. Garro concluded that the Plaintiff was manifesting symptoms

of a mental illness and required an evaluation for immediate treatment in a hospital setting.  Dr.

Garro subsequently applied to involuntarily hospitalize the Plaintiff pursuant to Mental Hygiene

Law § 9.37.

The Plaintiff maintains that in conducting a psychiatric evaluation that lasted no more

than approximately three minutes, Dr. Garro could not have gathered the necessary information

to satisfy professional standards to determine whether the Plaintiff posed a sufficient likelihood

of causing harm to himself or others.

At some point, other staff members at Stony Brook contacted the Plaintiff's mother to gather information regarding the Plaintiff's history. The Plaintiff's mother confirmed that he had never attempted suicide or had a past psychiatric history.

As a result of his confinement, Stony Brook billed the Plaintiff for services rendered that he did not authorize or he agree to pay for.

On March 22, 2011, Stony Brook transferred the Plaintiff to Brunswick, a private hospital, based upon Dr. Garro's application for involuntary admission pursuant to mental Hygiene Law § 9.37. Again, the Plaintiff did not consent to the transfer and subsequent confinement, nor did he agree to accept and pay for any services delivered by Brunswick.

The Defendant Inhennacho, M.D. confirmed admission of the Plaintiff pursuant to Mental Hygiene Law § 9.37 without conducting a psychiatric evaluation of the Plaintiff. Rather, the Plaintiff asserts, Dr. Inhennacho simply relied on Dr. Garro's prior assessment of the Plaintiff.

Shortly after the Plaintiff's admission to Brunswick hospital, the Defendant Lloyd Sookhu, M.D. conducted an examination of the Plaintiff for approximately ten minutes. Dr. Sookhu is a medical doctor and not a psychiatrist.

Within seventy-two hours of the Plaintiff's admission to Brunswick, the Defendant Khan, M.D., certified that the Plaintiff was in need of involuntary care and treatment pursuant to Mental Hygiene Law § 9.37 without conducting a psychiatric evaluation. The Plaintiff maintains that at no time during his confinement at Brunswick did a psychiatrist provide treatment to the Plaintiff. He remained involuntarily confined at Brunswick from March 22, 2011 until March 31, 2011, when he was released. As a result of this hospitalization, Brunswick and Dr. Sookhu billed the Plaintiff for services rendered that he did not authorize or agree to pay for.

On September 19, 2013, the Plaintiff filed this complaint against the Defendants, raising an array of claims, which are described later.

On January 9, 2014, Brunswick moved pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 8(a)(2), 12(b)(6), and 12(h)(3) to dismiss the complaint as against it for failure to state a cause of action.

On March 17, 2014, following a hearing on an order to show cause, the Court granted the Plaintiff leave to file a second amended complaint. At that time, the Court also granted Brunswick's request to have its motion to dismiss directed at the then-forthcoming second amended complaint.

The second amended complaint, formally interposed on March 18, 2014, raises the following claims: (1) a 42 U.S.C. § 1983 claim against Steele, Dr. Vertrees, and Dr. Margulies, alleging a violation of the right against unreasonable seizures as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitutions; (2) a 42 U.S.C. § 1983 claim against Drs. Garro, Ihennacho, and Khan, alleging a violation of the Plaintiff's substantive due process rights under the Fourteenth Amendment by authorizing the Plaintiff's commitment when he did not pose a danger to himself or others; (3) a 42 U.S.C. § 1983 claim against Dr. Garro alleging a violation of substantive due process under the Fourteenth Amendment by failing to apply "well accepted risk assessment criteria;" (4) a 42 U.S.C. § 1983 claim against Drs. Inhennacho and Khan alleging a violation of substantive due process under the Fourteenth Amendment by making an assessment of danger that did not assure some degree of accuracy; (5) a 42 U.S.C. § 1983 claim against Drs. Garro, Ihennacho, and Khan alleging a violation of procedural due process under the Fourteenth Amendment; (6) a claim for a violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, (the "ADA") against Stony Brook by allegedly

making stereotypical assumptions about the Plaintiff based upon his diagnosis of mental illness; (7) a claim for a violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 (the "Rehabilitation Act") against Brunswick; (8) a New York State law claim for medical malpractice against Dr. Garro for failing to apply "well accepted empirically based criteria for assessing dangerousness"; (9) a New York State law claim for medical malpractice against Drs. Ihennacho, Khan, and Brunswick for concluding that the Plaintiff was dangerous in the absence of an evaluation pursuant to Mental Hygiene Law § 9.37; and (10) a New York State law claim for medical malpractice against Brunswick for subjecting the Plaintiff to psychiatric treatment supervised by an individual other than a psychiatrist.

It bears mentioning that in his original complaint, the Plaintiff included an eleventh cause of action that alleged that by rendering treatment services to the Plaintiff without his consent, Stony Brook and Brunswick were not entitled to any payments related thereto and sought a declaration to that effect. The second amended complaint omits this cause of action and request for declaratory relief. Nevertheless, the preliminary statement in the second amended complaint states that the Plaintiff seeks a declaratory judgment against the Defendants – presumably, Stony Brook and Brunswick – that charged him for services he did not seek or require.

On March 25, 2014, the State Defendants moved pursuant to Rule 12(b)(1) and 12(b)(6) to dismiss the complaint for lack of subject matter jurisdiction and failure to state a claim.

## II.    DISCUSSION

### A. The Relevant Pending Claims

As noted above, the pending claims against Brunswick are the Rehabilitation Act claim and two separate New York State law claims for medical malpractice; against Steele is the 42 U.S.C. § 1983 claim alleging a violation of the Plaintiff's right against unreasonable seizures as

guaranteed by the Fourth and Fourteenth Amendments; against Stony Brook is the claim for a

violation of the ADA; and against Dr. Garro are two separate claims for a violation of

substantive due process, one claim for a violation of procedural due process, and the state law

claim for medical malpractice.  Again, there also appears to be a claim relative to payment of

medical bills against Brunswick and Stony Brook.

B.  The Rule 12(B)(1) Subject Matter Jurisdiction Standard

"A federal court has subject matter jurisdiction over a cause of action only when it 'has

authority to adjudicate the cause' pressed in the complaint." Arar v. Ashcroft, 532 F.3d 157, 168

(2d Cir. 2008) (quoting Sinochem Int'l Co. v. Malay Int'l Shipping Corp., 549 U.S. 422, 425, 127

S. Ct. 1184 (2007)), rev'd en banc on other grounds, 585 F.3d 559 (2d Cir. 2009).  "Determining

the existence of subject matter jurisdiction is a threshold inquiry, and a claim is 'properly

dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks

the statutory or constitutional power to adjudicate it.'" Id. (quoting Makarova v. United States,

201 F.3d 110, 113 (2d Cir. 2000)).

"When jurisdiction is challenged, the plaintiff bears the burden of showing by a

preponderance of the evidence that subject matter jurisdiction exists, and the district court may

examine evidence outside of the pleadings to make this determination." Id. (internal quotation

marks and citations omitted).  "[T]he court must take all facts alleged in the complaint as true

and draw all reasonable inferences in favor of plaintiff, but jurisdiction must be shown

affirmatively, and that showing is not made by drawing from the pleadings inferences favorable

to the party asserting it." Morrison v. Nat'l Austl. Bank Ltd., 547 F.3d 167, 170 (2d Cir.

2008)(internal citation omitted), aff'd on other grounds, 561 U.S. 247, 130 S. Ct. 2869, 177 L.

Ed. 2d 535 (2010).

C.  The Rule 12(b)(6) Motion to Dismiss Standard

When deciding a motion to dismiss under Fed. R. Civ. P. Rule 12(b)(6), the court must "accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." LaFaro v. New York Cardiothoracic Group, PLLC, 570 F.3d 471, 475 (2d Cir. 2009).  To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (citation omitted).  However, a complaint must do more than offer "naked assertions devoid of further factual enhancement," and a court is not "bound to accept as true a legal conclusion couched as a factual allegation." Id. (citation omitted).

D.  The Medical Bills Claim against Stony Brook

As a threshold matter, the Court finds that it lacks subject matter jurisdiction over any claim against Stony Brook relative to the payment of medical bills.

A claim that is barred by a state's sovereign immunity must be dismissed pursuant to the Eleventh Amendment for lack of subject matter jurisdiction. See Va. Office for Prot. & Advocacy v. Stewart, ⸺ U.S. ⸺, 131 S. Ct. 1632, 1637, 179 L. Ed. 2d 675 (2011) (noting that "the Eleventh Amendment . . . confirm[s] the structural understanding that States entered the Union with their sovereign immunity intact, unlimited by Article Ill's jurisdictional grant"); Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 54, 116 S. Ct. 1114, 134 L. Ed. 2d 252 (1996) ("For over a century [the Supreme Court has] reaffirmed that federal jurisdiction over suits against unconsenting States 'was not contemplated by the Constitution when establishing the judicial power of the United States.'")(citation omitted).

Eleventh Amendment immunity extends to a State when sued as a defendant in its own name and also, as here, to "state agents and state instrumentalities" such as Stony Brook when

"the state is the real, substantial party in interest." <u>Regents of the Univ. of Cal. v. Doe</u>, 519 U.S. 425, 429, 117 S. Ct. 900, 137 L. Ed. 2d 55 (1997) (internal quotation marks omitted); <u>Henny v. New York State</u>, 842 F. Supp. 2d 530, 543–544 (S.D.N.Y. 2012).  Further, sovereign immunity applies regardless of the type of relief sought. <u>See</u> <u>Henny</u>, 842 F. Supp. 2d at 545; <u>Fed. Mar. Comm'n v. S.C. State Ports Auth.</u>, 535 U.S. 743, 765, 122 S. Ct. 1864, 152 L.Ed.2d 962 (2002) ("[S]overeign immunity applies regardless of whether a private plaintiff's suit is for monetary damages or some other type of relief"); <u>Seminole Tribe</u>, 517 U.S. at 58, 116 S. Ct. 1114 (noting that the Supreme Court has "often made it clear that the relief sought by a plaintiff suing a State is irrelevant to the question whether the suit is barred by the Eleventh Amendment").

Accordingly, the Court grants that part of Stony Brook's motion to dismiss the claim against Stony Brook relative to payment of medical bills.

E.  <u>The ADA Claim Against Stony Brook and the Rehabilitation Act Claim Against Brunswick</u>

The ADA is intended "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1); <u>see</u> <u>Henrietta D. v. Bloomberg</u>, 331 F.3d 261, 272 (2d Cir. 2003).  The statute provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  Section 504 of the Rehabilitation Act similarly provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency." 29 U.S.C. § 794(a).

Courts generally apply the same legal standards when adjudicating claims arising under the ADA and ones arising under the Rehabilitation Act. Harris v. Mills, 572 F.3d 66, 73 (2d Cir. 2009).  Although there are differences between the statutes, "unless one of those subtle distinctions is pertinent to a particular case, [the Court] treat[s] claims under the two statutes identically." Henrietta D. v. Bloomberg, 331 F.3d at 272.  Indeed, "[t]he purpose of both statutes is to 'eliminate discrimination on the basis of disability and to ensure evenhanded treatment between the disabled and the able-bodied.'" Maccharulo v. New York State Dep't of Correctional Servs., No. 08 Civ. 301 (LTS), 2010 U.S. Dist. LEXIS 73312, at *7, 2010 WL 2899751 (S.D.N.Y. July 21, 2010) (quoting Doe v. Pfrommer, 148 F.3d 73, 82 (2d Cir. 1998)).

As a general matter, neither the ADA nor the Rehabilitation Act applies to claims regarding the quality of mental health services, Atkins v. County of Orange, 251 F.Supp.2d 1225, 1232 (S.D.N.Y. 2003), nor do the statutes "create a remedy for medical malpractice," Bryant v. Madigan, 84 F.3d 246, 249 (7th Cir. 1996) (applying the ADA).  Accordingly, an accusation that an individual was involuntarily committed on the basis of a mental disability "cannot serve as a basis for an ADA [or Rehabilitation Act] . . . violation for disability discrimination because such a finding would convert every involuntary commitment transport into a civil rights violation." Estate of Awkward v. Willingboro Police Dept., No. 07 Civ. 5083 (NLH), 2010 WL 3906785, at *13 (D. N.J. Sept.30, 2010).  In this regard, the Second Circuit has ruled that "section 504 prohibits discrimination against a handicapped individual only where the individual's handicap is unrelated to, and thus improper to consideration of, the services in question." United States v. University Hospital, 729 F.2d 144, 156 (2d Cir. 1984).

The Plaintiff cites Bolmer v. Oliveira, 594 F.3d 134 (2d Cir. 2010) in support of his ADA and Rehabilitation Act claims.  The appeal in Bolmer was in part from the district court's denial

of a state agency's motion for summary judgment seeking to dismiss the plaintiff's claims under the ADA on the basis of Eleventh Amendment immunity. The Plaintiff, who suffered from bi-polar disorder, claimed that the defendants had violated the ADA in ordering him involuntarily committed. The Plaintiff argued that the defendants' refusal, based on his mental illness, to credit his accurate assertion that he had a sexual relationship with his transitional housing case manager, and their treatment of his assertion as evidence of delusional dangerousness, was an actionable form of discrimination against his disability in violation of the ADA. The Second Circuit held that the Plaintiff had produced sufficient evidence to support his ADA claim.

The Plaintiff contends that this Court must reconcile the Second Circuit's decisions in University Hospital and the decision in Bolmer. The Plaintiff essentially seeks this Court to read Bolmer to hold that doctors discriminate under the ADA and the Rehabilitation Act whenever they forcibly hospitalize a patient on the basis of stereotypes about that patient's mental illness, even if the stereotypes relate to matters appropriately considered in deciding whether to involuntarily hospitalize an individual.

While the parties briefed the instant motions to dismiss, the Second Circuit issued an opinion, McGugan v. Aldana-Bernier, 12-4165-CV, 2014 WL 1978725 (2d Cir. May 16, 2014), rejecting this precise proposition, and also reconciling University Hospital and Bolmer. There, the Second Circuit stated as follows:

> Bolmer is susceptible of at least two interpretations. [The Plaintiff] asks us to read Bolmer as support for the proposition that doctors discriminate under the ADA whenever they forcibly hospitalize a patient on the basis of stereotypes about that patient's mental illness, even if the stereotypes pertain to matters appropriately considered in deciding whether to involuntarily hospitalize a patient. Under this reading, our holding in Bolmer would be incompatible with the prior holding of University Hospital. But it is also possible to read Bolmer as meaning that the defendants discriminated against the plaintiff because they assumed, on the basis of stereotypes, that no case worker would have had a sexual relationship with a person suffering from bi-polar disorder, so that the plaintiff's

claim of such a relationship must have been the result of erotomaniac delusions. Under this latter reading, the plaintiff stated a claim for discrimination because his bi-polar disorder was irrelevant to whether he had a sexual relationship with his case worker or whether he had erotomaniac delusions.

Although the first reading of Bolmer would be plausible if one read Bolmer on a stand-alone basis, such a reading would directly contradict University Hospital's prior binding precedent, which stated that "section 504 prohibits discrimination against a handicapped individual only where the individual's handicap is unrelated to, and thus improper to consideration of, the services in question." Univ. Hosp., 729 F.2d at 156. The first reading of Bolmer, which we reject, would also give plaintiffs an almost unfettered ability to re-frame claims of medical malpractice into federal claims of discrimination on the basis of disability.

We therefore think the better reading of Bolmer is the second. We understand Bolmer to hold that, as in . . . University Hospital, a plaintiff pleads an actionable claim of discrimination in the medical treatment context under the ADA or the Rehabilitation Act if she alleges that the defendants made treatment decisions based on factors that are "unrelated to, and thus improper to consideration of" the inquiry in question. This reading accords Bolmer with University Hospital and prevents an interpretation of the Rehabilitation Act that would federalize many (if not most) claims for medical malpractice.

Id. at *7-8.

Applying the Second Circuit's holding in McGugan, the Court finds that the Plaintiff has not plausibly alleged that Stony Brook or Brunswick forcibly hospitalized him on the basis of considerations that were "unrelated to" or "improper to consideration of" the likelihood that he posed a danger to himself or others. Because he has failed to make such allegations, he has not stated a claim of discrimination under the Rehabilitation Act or the ADA. The Plaintiff "cannot alter this conclusion by characterizing [Stony Brook and Brunswick's] conduct as based on discriminatory stereotyping of people with mental illness. If [Stony Brook and Brunswick's] decision was based on stereotyping, it was based on stereotyping of conditions that were appropriate to consider in making the ultimate determination to hospitalize." Id. at *8. Accordingly, while the Plaintiff may have alleged negligent medical treatment, he has not alleged actionable discrimination under the ADA or the Rehabilitation Act.

The Plaintiff also cites <u>Lesley v. Chie</u>, 250 F.3d 47, 49 (1st Cir. 2001), which held that a medical provider's judgment is to receive deference absent a showing that it lacked any reasonable medical basis in a claim of discriminatory denial of treatment. However, in so holding, the First Circuit explained "[t]his is not to say, however, that the Rehabilitation Act prohibits unreasonable medical decisions as such. Rather, the point of considering a medical decision's reasonableness in this context is to determine whether the decision was unreasonable *in a way that reveals it to be discriminatory*." <u>Id.</u> at 55. Therefore, even under the First Circuit's precedent, which this Court declines to follow as non-controlling, more than allegations of an improper medical decision are required to state an ADA or Rehabilitation Act claim.

Accordingly, the Court grants State Defendants' motion to dismiss the ADA claim against Stony Brook and grants Brunswick's motion to dismiss the Rehabilitation Act claim against it.

F. <u>The Remaining Claims Against Brunswick</u>

Having dismissed the only federal claim against Brunswick – namely, the Rehabilitation Act claim -- Brunswick would ask this Court to decline to exercise supplemental jurisdiction over the pendent state law claims against it, that is, the two New York State medical malpractice claims and the claim relative to unpaid medical bills.

"Under 28 U.S.C. § 1367(a) federal courts have supplemental jurisdiction to hear state law claims that are so related to federal question claims brought in the same action as to form part of the same case or controversy under Article III of the United States Constitution." <u>Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.</u>, 373 F.3d 296, 308 (2d Cir. 2004) (citing to <u>Cicio v. Does</u>, 321 F .3d 83, 97 (2d Cir. 2003) (internal quotations omitted). In order for the state law

claims to form part of the same controversy, they have to "derive from a common nucleus of operative fact." Id.

Contrary to Brunswick's contention, a common nucleus of operative fact can exist "even if the state law claim is asserted against a party different from the one named in the federal claim." Id. Finally, the Second Circuit has instructed that, "[i]n determining whether two disputes arise form a common nucleus of operative fact, we have traditionally asked whether the facts underlying the federal and state claims substantially overlapped . . . [or] the federal claim necessarily brought the facts underlying the state claim before the court." Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 335 (2d Cir. 2006) (citing to Lyndonville Sav. Bank & Trust Co. v. Lussier, 211 F.3d 697, 704 (2d Cir. 2000) (internal quotations omitted).

In the present matter, the state law claims against Brunswick are so closely related to the pending federal claims – including, the Section 1983 Fourth Amendment claim against Steele - that they form the same case or controversy. Accordingly, the Court denies Brunswick's motion to dismiss the pendent state law claims against it.

G.  The Section 1983 Claims

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and laws; (2) by a person acting under the color of state law. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993).

1.  The Fourth Amendment Claim Against Steele

In this case, the Plaintiff's involuntary commitment at Stony Brook and Brunswick constituted a seizure within the meaning of the Fourth Amendment, which protects against

unreasonable searches and seizures. See Glass v. Mayas, 984 F.2d 55, 58 (2d Cir. 1993). "The Fourth Amendment requires that an involuntary hospitalization 'may be made only upon probable cause, that is, only if there are reasonable grounds for believing that the person seized is subject to seizure under the governing legal standard.'" Glass, 984 F.2d at 58 (quoting Villanova v. Abrams, 972 F.2d 792, 795 (7th Cir. 1992)).

Here, the complaint itself indicates that the Suffolk County Police informed Steele of circumstances they believed to necessitate her presence as an OMH Mobile Crisis Unit worker and she spoke with the Plaintiff and also with the police. However, the Plaintiff alleges that there was no indication that he engaged in homicidal or other violent behavior by which others would be placed in reasonable fear of serious injury. Drawing all reasonable inferences in the Plaintiff's favor, the Court finds that the Plaintiff has set forth sufficient facts to support his Fourth Amendment claim against Steele. Accordingly, the Court denies the State Defendants' motion to dismiss this claim against him.

Alternatively, the State Defendants argue that this claim should be dismissed on the basis of qualified immunity. A defendant asserting a qualified immunity defense on a motion to dismiss "faces a formidable hurdle . . . and is usually not successful." Field Day, LLC v. County of Suffolk, 463 F.3d 167, 191-92 (2d Cir. 2006). The defense will succeed only where entitlement to qualified immunity can be established "based [solely] on facts appearing on the face of the complaint." McKenna v. Wright, 386 F.3d 432, 436 (2d Cir. 2004). For these reasons, a motion to dismiss "is a mismatch for immunity and almost always a bad ground of dismissal." Barnett v. Mount Vernon Police Dep't, 523 F. App'x 811, 813 (2d Cir. 2013)(quotation marks and citation omitted). "Defendants moving to dismiss a suit by reason of

qualified immunity would in almost all cases be well advised to move for summary judgment, rather than for dismissal under Rule 12(b)(6) or 12(c)." <u>Id.</u>

Here, the Court finds that the Defendants have failed to show "on the face of the complaint" that probable cause or arguable probable cause existed to involuntarily hospitalize the Plaintiff. <u>See</u> <u>McKenna</u>, 386 F.3d at 436. Therefore, the Court denies State Defendants' motion to dismiss the complaint – namely, the Fourth Amendment claim – as against Steele.

    2.  <u>The Substantive Due Process Claims Against Dr. Garro</u>

As noted above, the Plaintiff alleges that Dr. Garro violated his right to liberty under the substantive component of the due process clause, in two respects: first, by authorizing the Plaintiff's involuntary commitment when he did not pose a danger to himself or others and second, by failing to apply accepted risk assessment criteria.

The Due Process Clause of the Fourteenth Amendment provides that a state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend XIV, § 1. The Due Process Clause "was intended to prevent government from abusing [its] power, or employing it as an instrument of oppression." <u>Collins v. City of Harker Heights, Tex.</u>, 503 U.S. 115, 126, 112 S. Ct. 1061, 117 L. Ed. 2d 261 (1992) (quoting <u>DeShaney v. Winnebago County Dept. of Social Services</u>, 489 U.S. 189, 196, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989)) (internal quotation marks omitted). From this came the doctrine of substantive due process, "which protects against government conduct that deprives people of protected rights and truly 'shocks the conscience' of the court." <u>Simons v. New York</u>, 472 F. Supp. 2d 253, 265 (N.D.N.Y. 2007) (citing <u>Cnty. of Sacramento v. Lewis</u>, 523 U.S. 833, 846, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998)). Although substantive due process, on its face, encompasses a broad range of behavior, "the Supreme Court has repeatedly held that '[w]here a particular Amendment

provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.'" Bryant v. City of New York, 404 F.3d 128, 135 (2d Cir. 2005) (quoting Albright v. Oliver, 510 U.S. 266, 273, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994) (plurality opinion)).

Indeed, because the Plaintiff's claims sound in a search and seizure violation under the Fourth Amendment, it is the Fourth Amendment that provides the proper analytical framework. See e.g. Bryant v. City of N.Y., 404 F.3d 128, 136 (2d Cir. 2005) ("'Substantive due process analysis is . . . inappropriate . . . [where a] claim is "covered by" the Fourth Amendment.'") (citation omitted); Kastle v. Town of Kent, N.Y., 13 Civ. 2256, 2014 WL 1508703, at *9–10 (S.D.N.Y. Mar. 21, 2014) ("[P]laintiffs' claims are largely premised on alleged conduct proscribed by the Fourth Amendment. The Court concludes plaintiffs' claims are therefore substantially 'covered' by the Fourth Amendment . . . and declines to expand the concept of substantive due process to encompass such conduct. . . . Accordingly, plaintiffs' substantive due process claim is dismissed."); Pence v. Zifcak, CIV.A. 2004-3396 (DKC), 2007 WL 465199, at *6 (D. Md. Feb. 7, 2007)("All of Plaintiff's claims related to his transportation to, and involuntary commitment at, the hospital fall within the ambit of the Fourth Amendment Seizure Clause. Thus, that provision, "not the more generalized notion of 'substantive due process,' must be the guide for analyzing [Plaintiff's] claims.")(citation omitted). Therefore, the Court dismisses the substantive due process claims against Dr. Garro.

3. The Procedural Due Process Claim Against Dr. Garro

The Second Circuit has acknowledged that "[a]n involuntary civil commitment is a 'massive curtailment of liberty,' and it therefore cannot permissibly be accomplished without

due process of law." <u>Olivier v. Robert L. Yeager Mental Health Ctr.</u>, 398 F.3d 183, 188 (2d Cir. 2005) (citing <u>Rodriguez v. City of N.Y.</u>, 72 F.3d 1051, 1061 (2d Cir. 1995)). "[D]ue process does not permit the involuntary hospitalization of a person who is not a danger either to herself or to others . . ." <u>Rodriguez</u>, 72 F.3d at 1061. However, due process also does not require that a physician's assessment of the likelihood that a person will endanger herself or others be correct. <u>Id.</u> ("[W]e do not suggest that the clear-and-convincing standard of proof applies to a decision whether or not to order commitment in an emergency . . . ."). Instead, "due process does demand that the decision to order an involuntary emergency commitment be made in accordance with a standard that promises some reasonable degree of accuracy." <u>Id.</u>

New York's overall statutory scheme governing involuntary commitments has been held to "facially satisf[y] Fourteenth Amendment due process requirements." <u>Olivier</u>, 398 F.3d at 188 (citing <u>Project Release v. Prevost</u>, 722 F.2d 960, 972–74 (2d Cir. 1983)); <u>see also</u> <u>Capellupo v. Nassau Health Care Corp.</u>, 06-CV-4922 (JFB)(ETB), 2009 WL 1705749, at *7 (E.D.N.Y. June 16, 2009)("Therefore, if defendants' actions comported with the strictures of the New York Mental Hygiene Law, they also satisfied the requirements of procedural due process"); <u>Fisk v. Letterman</u>, 501 F. Supp. 2d 505, 525 (S.D.N.Y. 2007) (noting that "the Second Circuit has held that New York's Mental Hygiene Law meets the requirements of procedural due process").

Although the Court recognizes that a cognizable Fourteenth Amendment claim under Section 1983 can exist in certain involuntary commitment cases, the Court concludes that the Plaintiff has failed to articulate a plausible claim that he has been denied procedural due process with regard to his involuntary commitment. Indeed, the Plaintiff fails to identify any specific procedure contained in the Mental Hygiene Law that an evaluating physician must use – and here, failed to use – in determining whether a person satisfies the substantive statutory

requirements for involuntarily commitment. Accordingly, the Court grants the State Defendants' motion to dismiss the procedural due process claim against Dr. Garro.

## H. The New York State Medical Malpractice Claim Against Dr. Garro

Although the Court has dismissed the Plaintiff's federal causes of action against Dr. Garro, the Court observes no reason to decline to exercise supplemental jurisdiction over the Plaintiff's New York State medical malpractice claim against Dr. Garro. In the Court's view, the medical malpractice claim against Dr. Garro arises out of a common nucleus of operative facts as the pending federal claims, including the Fourth Amendment claim against Steele. Accordingly, the Court denies the State Defendants' motion to dismiss Plaintiff's medical malpractice claim against Dr. Garro.

## III. CONCLUSION

In sum, the Court grants in part and denies in part the separate motions to dismiss by Brunswick and the State Defendants. In particular, the Court grants Brunswick's motion as to **the** Rehabilitation Act claim and dismisses that claim against it. Otherwise, the Court denies Brunswick's motion to dismiss the complaint against it. In addition, the Court grants the State Defendants' motion as to the claim relative to payment of medical bills and the ADA claim against Stony Brook; and the procedural and substantive due process claims against Dr. Garro. Otherwise, the Court denies the State Defendants' motion to dismiss the complaint against them.

**SO ORDERED.**

Dated: Central Islip, New York
June 3, 2014

_____*Arthur D. Spatt*_____
    ARTHUR D. SPATT
    United States District Judge