UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
PATRICK BRYANT,

                    Plaintiff,

          -against-

KRISTEN STEELE, personally, THOMAS
VERTREES, M.D., personally, DAVID
MARGULIES, M.D., personally, BRENDA
GARRO, M.D., personally, STONY BROOK
UNIVERSITY MEDICAL CENTER,
THEDDEUS IHEANACHO, M.D., personally,
ABID IQBAL KHAN, M.D., personally,
LLOYD SOOKU, M.D., personally, and
BRUNSWICK HOSPITAL CENTER, INC.,

                    Defendants.
---------------------------------------------------------X

**F I L E D**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   MAY 22 2020   ★

LONG ISLAND OFFICE

**MEMORANDUM OF
DECISION & ORDER**
2:13-cv-5234 (ADS) (ARL)

<u>**APPEARANCES:**</u>

**Law Office of Ray Malone, PLLC**
*Attorneys for the Plaintiff*
207 Radio Avenue
Miller Place, NY 11764
        By:    Raymond James Malone, Esq., Of Counsel.

**Touro College Jacob D. Fuschberg Law Center, Civil Rights Clinic**
*Attorneys for the Plaintiff*
225 Eastview Drive
Central Islip, NY 11722
        By:    William M. Brooks, Esq.,
               Michelle K. Caldera, Esq., Of Counsel.

**New York State Attorney General's Office**
*Attorneys for the Defendants Kristen Steele, personally; Thomas Vertrees, M.D., personally;
David Margulies, M.D., personally; Brenda Garro, M.D, personally; and Stony Brook
University Medical Center*
200 Old Country Road Suite 240
Mineola, NY 11501
        By:    Ralph Pernick, Assistant Attorney General,
               Toni E. Logue, Assistant Attorney General,
               Dorothy O. Nese, Assistant Attorney General.

**Bartlett, LLP**
*Attorneys for Theddeus Iheanacho, M.D., personally; Brunswick Hospital Center, Inc.; Abid
Iqbal Khan, M.D.*
170 Old Country Road, Suite 400
Mineola, NY 11501
      By:    Brian E. Lee, Esq.
             John Francis Yoon, Esq, of Counsel.

**Lewis, Johs, Avallone, Aviles**
*Attorneys for Defendant Brunswick Hospital Center Inc.*
425 Broad Hollow Road
Melville, NY 11747
      By:    Greg M. Mondelli, Esq., Of Counsel.


**SPATT, District Judge:**

Familiarity with the prior factual and procedural history of the case is presumed.

However, by way of background, Plaintiff Patrick Bryant (the "Plaintiff") brought a civil rights

and medical malpractice action in March 2011, arising out of his involuntary hospitalization by

the Defendants Stony Brook Medical Center ("Stony Brook") and the Brunswick Hospital Center

("Brunswick").

The Plaintiff's third amended complaint, filed in December 2014, raises the following

nine claims: (1) a 42 U.S.C. § 1983 claim under the Fourth and Fourteenth Amendments against

Kristen Steele ("Steele"), Thomas Vertrees ("Vertrees"), and David Margulies ("Margulies") for

authorizing or otherwise facilitating his transfer to Stony Brook; (2) a § 1983 clam under the

Fourth and Fourteenth Amendments against Brenda Garro ("Garro") for evaluating the Plaintiff

and then authorizing his transfer to Brunswick; (3) a § 1983 claim under the Fourth and

Fourteenth Amendments against Theddeus Iheanacho ("Iheanacho"), and Abid Iqbal Khan

("Khan") for authorizing the Plaintiff's confinement at Brunswick; (4) a § 1983 due process

claim against Iheanacho and Khan for violating the Plaintiff's liberty rights when he posed no

danger to himself or others; (5) a § 1983 due process claim against Iheanacho and Khan for

failing to conduct a psychiatric evaluation of the Plaintiff; (6) a medical malpractice claim against Garro for conducting only a three-minute examination of the Plaintiff; (7) a medical malpractice claim against Iheanacho, Khan, and Brunswick for concluding the Plaintiff was dangerous, in the absence of conducting an evaluation, pursuant to New York Michael Hygiene Law § 9,37; (8) a medical malpractice claim against Brunswick for subjecting the Plaintiff to psychiatric treatment supervised by a non-psychiatrist; and (9) a medical bills claim against Lloyd Sooku and Brunswick for rendering treatment to the Plaintiff without his consent. The Court dismissed the action as to Sooku in May 2015.

Presently before the Court are two Federal Rule of Civil Procedure ("FED. R CIV. P.") 56 motions for summary judgment, the first filed by Steele, Garro, Margulies, and Vertrees (the "State Defendants"), and the other by Iheanacho and Khan (the "Brunswick Defendants"). The background section of this opinion summarizes the facts relevant to both motions. The discussion section analyzes the two motions separately. For the reasons that follow, the Court denies the State Defendants' motion in its entirety, and grants the Brunswick Defendants' motion in its entirety.

## I.   BACKGROUND

Both summary judgment motions contain Local Rule 56.1 statements. These statements refer to deposition testimony, affidavits, and other items in the record. The Plaintiff in turn submits two Rule 56.1 counterstatements. Throughout his counterstatements, the Plaintiff affirms that the items cited to in the record contain the proffered information, but he denies the accuracy of that information. Unless otherwise noted, the following facts are undisputed and drawn from the parties' Local Rule 56.1 statements.

3

## A. Factual History

### 1. The Events Preceding the Plaintiff's Involuntary Hospitalization

The following information comes from the State Defendants' Rule 56.1 statement, ECF 180-1, and the Plaintiff's corresponding Rule 56.1 counterstatement, ECF 186.

In December 2010, the Plaintiff claimed that he started receiving harassing calls from people with Haitian or Jamaican accents, who would leave messages threatening to kill him. Over the next few months, the Plaintiff received numerous calls per week in which he would hear "long pauses, no one answer[ing], and heavy breathing." The State Defendants allege that, in a deposition, the Plaintiff testified that he believed the phone calls related to a dispute he had with a man named Michael Malloy some four years prior. ECF 180-1 at 3. The Plaintiff contends that he has no knowledge of whether the phone calls were connected to Malloy. ECF 186 at 3.

On February 7, 2011, the Plaintiff contacted the Suffolk County Police Department ("SCPD"), claiming that Malloy "was going to try and have Haitians try to kill him." ECF 180-1 at 3. The SCPD generated a field report with this information. *Id.* The Plaintiff admits that the field report contains this information, but denies its accuracy. ECF 186 at 3. Two SCPD officers visited the Plaintiff at his home on March 19, 2011, to inform the Plaintiff that they had investigated the phone calls.

On March 21, 2011, an SCPD officer informed a member of the Suffolk County Mobile Crisis Team ("MCT") about the Plaintiff. Steele, a social worker for the MCT, said in an MCT data form that the SCPD referred the matter because the Plaintiff had complained about the phone calls; that he later wrote to the SCPD, claiming to live in fear; and that he also wrote that one of the SCPD officers was involved in a conspiracy against him. ECF 180-1 at 3. The

4

Plaintiff admits that the information alleged is contained in the data form, but denies believing that any police officers were involved in the conspiracy. ECF 186 at 5. Steele also said that the SCPD informed her of a criminal complaint filed against the Plaintiff by his father, and that the Plaintiff testified to this during a deposition, ECF 180-1 at 4, though the Plaintiff denies that his father ever made such a complaint, ECF 186 at 6.

Also on March 21, 2011, the MCT—including Steele and two SCPD officers—arrived at the Plaintiff's home to talk to him. Steele said that the Plaintiff refused the MCT entry into his home, and agreed only to speak with them in front of his garage door. ECF 180-1 at 4. Steele filled out an MCT data form describing the Plaintiff as "minimally cooperative, guarded, agitated[,] paranoid" and "suspicious." She also noted that the Plaintiff reported that people were taking pictures of his home, and that the Plaintiff admitted to owning firearms, saying that he would have used them to defend himself. ECF 180-1 at 4. This caused Steele to feel threatened. *Id.* In a pre-screening admission form for a psychiatric center, Steele reported that the Plaintiff had said "you're lucky I didn't take out one of my guns and shoot you." *Id.* The Plaintiff agrees that this information is in the report, without conceding the report's accuracy, though he denies having said anything about defending himself with firearms. ECF 186 at 7–8. Steele also observed two bleach bottles in a car located inside the Plaintiff's garage labeled "holy water." ECF 180-1 at 5. The Plaintiff denies that the bottles contained bleach. ECF 186 at 8.

Steele telephoned Vertrees, the Chief resident at Stony Brook's Comprehensive Psychiatric Emergency Program ("CPEP"). She told Vertrees that the Plaintiff possessed firearms; had made multiple 911 calls and told the police that he was feeling endangered by unspecified Haitians; and said that was being stalked outside his house. She also told Vertrees that the Plaintiff presented as "very paranoid," ECF 180-1 at 5, though the Plaintiff claims that

Steele had said he was "somewhat paranoid," ECF 186 at 9. Steele then sent her MCT Data Form to Vertrees and his attending physician, Margulies.

### 2. The Plaintiff's Hospitalization at Stony Brook

Vertrees and Margulies discussed the information reported by Steele. Margulies believed that the Plaintiff posed a threat to himself and others, and directed Vertrees to authorize transport for the Plaintiff to Stony Brook's CPEP for further evaluation. After they made the decision to transport the Plaintiff, neither Vertrees nor Margulies had any involvement with the Plaintiff or his treatment.

The SCPD transported the Plaintiff to Stony Brook and filled out an incident report that reiterated Steele's synopsis of the encounter. ECF 180-1 at 6. The Plaintiff again admits that the report contains the same information alleged by Steele, but he once again denies that he kept firearms in his home for the purpose of defending himself. ECF 186 at 11. The SCPD escorted the Plaintiff into his home so he could change before his transportation, and while he changed, the police found four rifles and confiscated them.

The Plaintiff arrived at Stony Brook on March 21, 2011 at 9:59 pm. His medical records showed that he was a 49-year-old male with a past medical history that included multiple motor vehicle accidents that resulted in severe, chronic back pain treated with a regimen of morphine and Percocet. The Plaintiff presented as "irritable and guarded," and he refused to secure a large sum of cash in the hospital safe or to provide a urine sample. ECF 180-1 at 6. The Plaintiff denies the allegation about the sum of cash. ECF 186 at 12.

The State Defendants allege that Nurse Practitioner Cheranne Morse and Defendant Garro, the attending psychiatrist, evaluated the Plaintiff at 9:10 am on the following day, March 22, 2011. ECF 180-1 at 7. The Plaintiff "denies that he was evaluated together" by Morse and

Garro. ECF 186 at 13. The Plaintiff's Comprehensive Psychiatric Assessment states that the Plaintiff had:

> contacted police several months ago [and] believed "Haitians" or "Jamaicans" have been "hired out to do something" to him. [He] states he went to the 6th precinct last week and reiterated his concerns [and] believed a sergeant is also involved. Mobile Crisis Team report documents [he] believed said people have been taking pictures of him. Police removed [his] hunting rifles which he stated he would've used to defend himself. [He] also had unlabeled bleach bottles in his car marked "Holy Water."

ECF 180-1 at 7. The Plaintiff again denies that he would have used the rifles for self-protection. CF 186 at 13.

At Stony Brook, the Plaintiff was documented as denying auditory and visual hallucinations, and that he "continue[d] with persecutory delusions." ECF 180-1 at 7. The Plaintiff denies having had persecutory delusions. ECF 186 at 14. The State Defendants allege that the Plaintiff maintained his belief that someone had "hired out" the unspecified Haitian or Jamaican individuals to harm him, ECF 180-1 at 7, and the Plaintiff denies believing that someone had hired his unknown assailants, ECF 186 at 14. He also admits that his assessment described him as anxious, unkempt, guarded, and internally occupied with delusions of persecution, but he does not concede the assessment's accuracy. ECF 180-1 at 7; ECF 186 at 15.

Stony Brook clinicians, including Garro, diagnosed the Plaintiff with "Psychosis not Otherwise Specified" and deemed him to require involuntary admission:

> Although [he] denies [suicidal and homicidal ideations]/intent or plan, he is currently a danger to others due to persecutory delusions [with] increased paranoia. Police confiscated [his] firearms he reported [he] would have used to defend himself. [He] appears internally preoccupied, disheveled, unkempt and not attending to own basic needs. [He] requires [inpatient] hospitalization for stabilization and safety.

7

ECF 180-1 at 8. The Plaintiff denies that he was a danger to others; intended to use the confiscated firearms to defend himself; or that he had failed to attend to his basic needs. ECF 186 at 15–16.

Pursuant to State Mental Hygiene Law § 9.37, Garro completed the New York State Department of Health's Certificate of Examination by Director of Community Services or Designee and Application of Involuntary Admission on Certificate of a Director of Community (the "§ 9.37 Certificate"). She requested therein that the Plaintiff be involuntarily admitted for "a mental illness for which immediate impatient care and treatment in a hospital is appropriate." ECF 180-1 at 8. The Plaintiff denies he was so mentally impaired. ECF 186 at 16. The Plaintiff was then transferred to Brunswick for an inpatient psychiatric admission on the evening of March 22, 2011. ECF 180-1 at 8. The Plaintiff is unsure as to whether the transfer occurred that morning or that evening. ECF 186 at 17.

### 3. The Plaintiff's Hospitalization at Brunswick

The Court derives the information regarding the Plaintiff's treatment at Brunswick from Defendants Iheanacho and Khan's Rule 56.1 statement, ECF 181-2, and the Plaintiff's corresponding counterstatement, ECF 187.

The Brunswick Defendants allege that on March 22, 2011, Iheanacho performed his own thorough psychiatric evaluation of the Plaintiff and confirmed that the Plaintiff required involuntary confinement. ECF 181-2 at 6. They further contend that The Plaintiff's expert acknowledged this examination during a deposition. *Id.* They further assert that Iheanacho documented the Plaintiff as believing that persons of Jamaican and Haitian background were trying to torture and kill him; that the Plaintiff told him he has a feeling someone, possibly someone named "Mallery," was going to torture and kill him; that he had phone records, voice

8

messages, and other evidence to prove this; and, that he had complained to the SCPD that they had failed to thoroughly investigate the threat. *Id.* Conversely, the Plaintiff denies that Iheanacho examined him; he "disputes" that his expert acknowledged the examination; and while he does not dispute the that Iheanacho wrote the above-listed items in his report, he denies having ever met Iheanacho, and accordingly claims that he did not provide any of the information that Iheanacho documented. ECF 187 at 17–18.

The Brunswick Defendants also assert that Iheanacho's mental status examination of the Plaintiff provided in part that (1) the Plaintiff had a disheveled and perplexed appearance; (2) his speech was low-toned, soft, intense, and illogical; (3) he had a dysphoric mood; (4) he was alert and reactive; (5) he was paranoid; and (6) that he was cooperative. ECF 181-2 at 7. The Plaintiff disputes that Iheanacho gathered this information by evaluating him. ECF 187 at 20. Iheanacho concluded that the Plaintiff suffered from paranoid delusion because his claims of possibly being tortured and killed had no basis in reality. ECF 181-2 at 7. The Plaintiff phrases his next objection in a way that suggests he was in fact personally evaluated by Iheanacho: "[t]he plaintiff admits that Dr. Iheanacho, *when evaluating the plaintiff*, concluded that the plaintiff had thoughts that were not based on reality. However, the plaintiff further asserts that upon questioning at his deposition, Dr. Iheanacho recognized that Mr. Bryant's thinking could have been based in reality." ECF 187 at 21 (emphasis added). In addition, Iheanacho believed the Plaintiff to be a risk to himself and to others because of his delusions. ECF 181-2 at 7. However, the Plaintiff disputes the conclusion, and once again challenges the notion that Iheanacho ever examined him. ECF 187 at 21–22.

Following the Iheanacho examination, Khan conducted a face-to-face 72-hour examination of the Plaintiff on March 25, 2011. ECF 181-2 at 7–8. The Plaintiff's expert

acknowledged this examination. *Id.* at 8. Khan said that it was his independent professional and medical opinion that the Plaintiff needed to be retained as an involuntarily admitted patient. *Id.* In this examination, Khan documented that the Plaintiff exhibited paranoid delusions that required additional hospitalization, and he later testified that the Plaintiff posed a risk of harm to others, based on his delusions and paranoia, as well as his complete denial that there was a problem; his refusal to engage in any meaningful dialogue with any staff member; his refusal to take medication; and his access to firearms *Id.* Similar to his allegations concerning Iheanacho, the Plaintiff disputes that Khan personally examined him, meaning that Khan could not have exercised his independent medical judgment. ECF 187 at 22–23. The Plaintiff also disputes the accuracy of Khan's conclusions about his being a danger to others. *Id.* at 24–25.

### 4. The Plaintiff's Release

The Plaintiff's diagnosis at Brunswick mirrored the one he had at Stony Brook: psychosis not otherwise specified, and an estimated length of stay of between one and two weeks. The Plaintiff remained paranoid about his beliefs for some time following his admission at Brunswick.

The Plaintiff did not exhibit any aggression or agitation during his treatment. On March 31, 2011, the Plaintiff was deemed to no longer present a danger to himself or others. That same day, the Plaintiff was relieved with a prescription of Risperdal, a diagnosis of psychosis not otherwise specified; and a referral to outpatient care. However, the Plaintiff did not follow up with several attempts to contact him.

### B. Procedural History and the Pending Motions

The Plaintiff filed the original complaint in September 2013. ECF 1. In the third amended complaint, which is the operative complaint for purposes of the pending motions, the

Plaintiff raised nine claims. ECF 116. He raised the first five claims under § 1983, that: (1) Steele, Vertrees, and Margulies violated his right against unreasonable searches and seizures under the Fourth and Fourteenth Amendments when they did not possess probable cause to believe that he had a mental illness likely to result in serious harm to himself or others; (2) Garro authorized his detainment and transfer to Brunswick when no basis existed to believe that the Plaintiff met the criteria under § 9.37 for involuntary hospitalization; (3) Iheanacho and Khan violated the Plaintiff's right against unreasonable seizures as guaranteed by the Fourth and Fourteenth Amendments when they authorized his involuntary confinement at Brunswick, despite there being no probable cause for the confinement under § 9.37; (4) Iheanacho and Khan violated the Plaintiff's right to liberty under the Due Process Clause when they authorized his involuntary confinement, even though he did not present a danger to himself or others; and, (5) Iheanacho and Khan violated the Plaintiff's right to liberty under the Due Process Clause in failing to conduct a psychiatric evaluation of the Plaintiff to determine whether he was a danger to himself or others. *Id.* at 14–16.

The Plaintiff's sixth, seventh, and eighth claims were for medical malpractice, against: (6) Garro for conducting a "three minute psychiatric evaluation" and failing to apply established empirically based criteria for assessing dangerousness; (7) Iheanacho, Khan, and Brunswick for deeming the Plaintiff dangerous in the absence of conducting an evaluation pursuant to § 9.37; and, (8) Brunswick for subjecting the Plaintiff to psychiatric treatment supervised by an individual other than a psychiatrist. *Id.* at 16–17. As to the ninth and final claim, the Plaintiff alleged that Sooku and Brunswick never formed an enforceable contract with the Plaintiff for medical treatment, and, that accordingly, the Plaintiff was not liable for any outstanding medical bills. *Id.* at 17. The Plaintiff asked for compensatory damages; punitive damages; an injunction

11

directing Brunswick to reimburse him for any Medicaid or Medical liens and to make no attempts at collection; an injunction prohibiting Brunswick and Sook from assessing any care or treatment charges; attorney fees; and costs. *Id.* at 17–18. The Court dismissed the action as to Sooku on May 6, 2015. ECF 134.

Presently before the Court are the State Defendants' and the Brunswick Defendants' FED. R. CIV. P. motions for summary judgment. ECF 180, 181.

## II.    DISCUSSION

In addressing the two summary judgment motions, the Court first provides the standard for Rule 56 motions. The Court then analyzes each summary judgment motion separately, ruling on the State Defendants' motion first, and the Brunswick Defendants' motion second. For the reasons that follow, the Court denies State Defendants' motion and grants the Brunswick Defendants' motion.

### A. The Legal Standard

Rule 56(a) provides that a court may grant summary judgment when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

"A genuine issue of fact means that 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "Where the moving party demonstrates 'the absence of a genuine issue of material fact,' the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265

(1986)).  "The evidence of the party opposing summary judgment is 'to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'"  *Wright*, 554 F.3d at 266 (parenthetically quoting *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996)).  However,  to defeat a motion for summary judgment, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts," and the party "may not rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (internal quotation marks omitted).

"When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).  In addition, Courts routinely reject self-serving affidavits as bases for establishing a genuine dispute of material fact. *See Clark v. Travelers Cos., Inc.*, No. 16-CV-02503, 2020 WL 473616, at *9 (E.D.N.Y. Jan. 29, 2020) (Spatt, *J.*); *Pressley v. City of New York*, No. 11-CV-03234, 2016 WL 1271480, at *3 (E.D.N.Y. Mar. 31, 2016) ("[A] self-serving affidavit that merely reiterates conclusory allegations in affidavit form" is "insufficient to preclude summary judgment.").

**B.  The State Defendants' Summary Judgment Motion**

The State Defendants' summary judgment motion invokes the Plaintiff's first, second, and sixth causes of action.  The Court provides the parties arguments as to those causes of action, and then addresses each of them in turn.

**1.  The Parties' Arguments**

The State Defendants argue that there is no question that the Steele, Vertrees, and Margulies complied with Mental Hygiene Law § 9.45 in authorizing the Plaintiff's transport to

Stony Brook.  ECF 180-2 at 6–8.  They also say there is no material issue of fact that probable cause existed for the involuntary transport and admission of the Plaintiff at Stony Brook.  *Id.* at 8–9.  Accordingly, the Court should grant the summary judgment motion as to the Plaintiff's first and second claims.  *Id.* at 6–9.  The State Defendants also argue that should any of the § 1983 claims survive, that the State Defendants are entitled to qualified immunity.  *Id.* at 14–15.

As to the sixth cause of action, the State Defendants contend that upon dismissing the Plaintiff's § 1983 claims, that it should decline to exercise supplemental jurisdiction over the medical malpractice claim.  *Id.* at 10–11.  In the alternative, they argue that the medical malpractice clam lacks merit, because (a) there is nothing in the medical records at Stony Brook to indicate that Garro interviewed the Plaintiff for only three minutes; (b) the record reveals that Garro based her assessment of the Plaintiff on the interview, the results of various medical tests, the ten-page Comprehensive Psychiatric Assessment completed by Nurse Practitioner Cheranne Morse, the MCT's documentation, and information from the SCPD.  *Id.* at 11–12.  They also note that the clinicians at Brunswick reached the same conclusions as Garro concerning the Plaintiff's mental state.  *Id.* at 13.

In support of their summary judgment motion, the State Defendants submit a declaration by Steele, in which she describes the SCPD's referral of the Plaintiff's case to the MCT; the visit to the Plaintiff's home; and her interactions with Vertrees and Margulies  ECF 180-3.  They also submit a copy of the SCPD's field report of the Plaintiff's initial complaint about the phone calls; the MCT's records concerning the Plaintiff; the Plaintiff's medical records at Stony Brook; the Plaintiff's medical records at Brunswick; and portions of depositions of the Plaintiff and each of the State Defendants. ECF 180-5.

14

In opposition, the Plaintiff argues that the State Defendants lacked probable cause to believe that he met the criteria for transport and detainment under §§ 9.45 and 9.37, namely in that Steele and Garro have acknowledged that the Plaintiff had not engaged in any homicidal or violent behavior.  ECF 192 at 12–13.  In addition, he contends that the testimony of his expert, Dr. Kenneth Selig, "detail[s] the numerous ways the state defendants lacked a reasonable basis to believe" that the Plaintiff met the §§ 9.45 and §§ 9.37 requirements.  *Id.* at 13.  He also refers to his lack of any history of violent behavior, and Garro's brief evaluation of him at Stony Brook.  *Id.* at 13–14.

The Plaintiff also submits, *inter alia*, a portion of the deposition of one of the SCPD officers who accompanied Steele to his residence, in which that officer testified that he didn't recall the Plaintiff's threatening to use his firearms to protect himself,  ECF 188-2 at 4; portions of Steele's deposition, in which she said that, other than threatening her at his home, that she was unaware of any other violent or suicidal conduct by the Plaintiff, ECF 188-4 at 12–13; and portions of Garro's deposition, in which she testified the Plaintiff engaged in no violent behavior at Stony Brook, ECF 188-5 at 5–6.

The Plaintiff further contends that the qualified immunity defense does not protect the State Defendants because they violated clearly established law, and that it was not objectively reasonable for them to believe that they were not violating the Plaintiff's constitutional rights.  *Id.* at 17–28.  Finally, the Plaintiff contends the Court should not dismiss the medical malpractice clam against Garro because a jury can reasonably conclude that the failure to properly assess the Plaintiff resulted in the State Defendants improperly deciding on his dangerousness.  *Id.* at 29.  The State Defendants essentially reiterate their arguments in reply.  ECF 194.

### 2. As to the First and Second Causes of Action

### i.    The First Cause of Action

Concerning the first cause of action, the State Defendants do not contest that the Plaintiff's involuntary commitment is a Fourth Amendment seizure. Instead, they contend that they had probable cause for seizing the Plaintiff. An involuntary hospitalization pursuant to New York Mental Hygiene Law does not violate the Fourth Amendment if it is based on probable cause. *Fisk v. Letterman*, 501 F. Supp. 2d 505, 526 (S.D.N.Y. 2007) (citing *Anthony v. City of New York*, 359 F.3d 129, 137 (2d Cir. 2003)). Probable cause exists for an involuntary hospitalization if "there are reasonable grounds for believing that the person seized is dangerous to herself or to others." *Id.*; *see Pecou v. Forensic Comm. Personnel*, No. 06-CV-3714, 2010 WL 2787588, at *8 (E.D.N.Y. May 14, 2010) (Bloom, M.J.), *adopted by,* 2010 WL 2787587 (E.D.N.Y. July 9, 2010); *Capellupo v. Nassau Health Care Corp.*, No. 06-CV-4922, 2009 WL 1705749, at *6 n.7 (E.D.N.Y. June 16, 2009).

For a mental health seizure, the law requires only "a probability or substantial chance of dangerous behavior, not an actual showing of such behavior." *Heller v. Bedford Cent. Sch. Dist.*, 144 F. Supp. 3d 596, 622 (S.D.N.Y. 2015) (internal quotation marks omitted). Determining probable cause to justify a mental health seizure requires courts to "look to 'the specific observations and information available' at the time of the seizure." *Aouatif v. City of New York*, No. 07-CV-1302, 2019 WL 2410450, at *9 (E.D.N.Y. May 31, 2019) (quoting *Myers v. Patterson*, 819 F.3d 625, 633 (2d Cr. 2016)).

Even in the absence of probable cause, a party may still receive quailed immunity that shields him from § 1983 liability. The qualified immunity defense is:

> intended to strike a fair balance between (1) the need to provide a realistic avenue for vindication of constitutional guarantees, and (2) the need to protect public officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority. The qualified immunity doctrine protects government officials from civil liability in the performance of discretionary functions as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.

*Lee v. Sandberg*, 136 F.3d 94, 100–01 (2d Cir. 1997) (internal citations and quotation marks omitted); *accord Hill v. City of New York*, 45 F.3d 653, 663 (2d Cir. 1995) (noting that under qualified immunity, "a government official may claim immunity from suit only when in light of clearly established law and the information the official possesses, it was objectively reasonable for him to think that his actions were lawful"); *Mediavilla v. City of New York*, 259 F. Supp. 3d 82, 95 (S.D.N.Y. 2016) ("the doctrine of qualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments' by immunizing them from suit for damages unless their conduct violated clearly established constitutional rights of which a reasonable person would have known.'" (quoting *Stanton v. Sims*, 571 U.S. 3, 6, 134 S. Ct. 3, 187 L. Ed. 341 (2013)).

Qualified immunity provides "ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1089 L. Ed. 2d 271 (1986). Whether or not individual defendants are entitled to qualified immunity is a question of law. *See Hunter v. Bryant*, 502 U.S. 224, 228, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991) (noting that qualified immunity should be decided "at the earliest possible stage in the litigation"); *Rodriguez v. Phillips*, 66 F.3d 470, 475 (2d Cir. 1995) ("Since qualified immunity is intended to protect government officials from the harassing and expensive burdens of litigation as well as the threat of monetary damages, courts have encouraged the use of summary judgment as a procedural device to dispose early in the litigation process of those claims barred by

17

qualified immunity."); *see also Hansen v. Town of Smithtown*, 342 F. Supp. 3d 275, 295 (E.D.N.Y. 2018) (Spatt, *J.*) (collecting cases).

The Supreme Court has explained that "officers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *Dist. of Columbia v. Wesby*, --- U.S. ----, 138 S. Ct. 577, 589, 199 L. Ed. 2d 453 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664, 132 S. Ct. 2088, 182 L. Ed. 2d 985 (2012)); *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011) (same); *see also Simms v. Vill. of Albion*, 115 F.3d 1098, 1106 (2d Cir. 1997) (holding that qualified immunity protects public officials "from civil damages liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or insofar as it is objectively reasonable for them to believe that their acts do not violate those rights" (internal quotation marks omitted)).   A principle is clearly established if it has a "sufficiently clear foundation in then-existing precedent." *Wesby*, 138 S. Ct. at 589; *see Mudge v. Zugalla*, 939 F.3d 72 (2d Cir. 2019).

The Supreme Court has "repeatedly stressed that courts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question of whether the official acted reasonably in the particular circumstances that he or she faced.'" *Wesby*, 135 S. Ct. at 590 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 134 S. Ct. 2012, 2023, 188 L. Ed. 2d 1056 (2014)).   For the above-mentioned individual Defendants' conduct to be unlawful, it must have been clearly established either by a Supreme Court or Second Circuit Court of Appeals case directly on point, or there must be agreement from other federal courts. *See Moore v. Vega*, 371 F.3d 110, 115 (2d Cir. 2004) ("Only Supreme Court and Second Circuit

18

precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." (citing *Townes v. City of New York*, 176 F.3d 138, 144 (2d Cir. 1999)).

Here, the Rule 56.1 statements leave little in the way of undisputed facts that would trigger a ruling on probable cause that the Plaintiff was a danger to himself or others. The basis for Steele's calling Stony Brook are the Plaintiff's claim that unknown Haitians and Jamaicans, are threatening to kill him, and that the SCPD is somehow involved; that unknown people are surveilling him at his home; that he has multiple firearms and threatened to use them, both in general terms and with specificity to Steele and the other visitors on March 31, 2011; that he was paranoid; and that he possessed two containers of bleach labeled "holy water." The Plaintiff agrees that he called the police to complain about the unknown phone calls; about the people surveilling him; and that he possessed firearms.

Otherwise, the parties accounts diverge. The Plaintiff and the State Defendants dispute whether he threatened to use the firearms; whether the SCPD was involved in a conspiracy against him; and whether the bottles in his car contained bleach. They even disagree on the extent of his paranoia. The Court observes that the Plaintiff relies not only on his own assessment of the facts, but on statements made by one of the SCPD officers, who could not recall whether the Plaintiff had threatened to use his firearms to protect himself. The Court further observes that the Plaintiff relies on statements by multiple State Defendants who pin his designation as dangerous solely upon his disputed threatening statement about defending himself with his firearms.

Drawing all justifiable inferences in the favor of the Plaintiff, the Court holds that the undisputed facts do not merit a finding of probable cause to transport the Plaintiff to Stony Brook. *See Virgil v. City of New York*, No. 17-CV-5100, 2019 WL 4736982, at *5 (E.D.N.Y.

Sept. 27, 2019) ("[A]fter drawing all reasonable inferences in Plaintiff's favor, the Court finds that genuine disputes of material fact prevent it from determining that Defendants had probable cause to arrest Plaintiff. Accordingly, Defendants' for summary judgment as to Plaintiff's false arrest claim is denied."); *Wright v. Undercover Officer #84*, No. 15-CV-4498, 2018 WL 4042101, at *8 (S.D.N.Y. Aug. 22, 2018); *Graham v. City of New York*, 928 F. Supp. 2d 610, 617 (E.D.N.Y. 2013) (denying summary judgment on false arrest claim, finding genuine issue of material fact and deeming it appropriate for a jury to decide which party's version of the facts should be credited).

In addition, the Court also declines to award qualified immunity to Steele, Vertrees, and Margulies as to the first cause of action. The decision whether to apply the shield of qualified immunity is a mixed question of law and fact. *Berg v. Kelly*, 897 F.3d 99, 109 (2d Cir. 2018); *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004). In the absence of a material fact dispute, a district court may assess the reasonableness of a party's conduct based on the circumstances presented, and rule on qualified immunity at the summary judgment stage. *Anderson v. City of New York*, 817 F. Supp. 2d 77, 90 (E.D.N.Y. 2011) (citing *Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995)). However, when there is a dispute of material facts, "'the factual questions must be resolved by the factfinder.'" *Id.* (citing *Kerman*, 374 F.3d at 109).

In this case, a genuine dispute exists as to much of the facts that would have justified an involuntary transfer to Stony Brook, *i.e.*, whether the Plaintiff in fact made the threatening statement about defending himself with his firearms. Given this factual dispute, the Court may not rule on qualified immunity at this stage of the litigation. *See Myers*, 819 F.3d at 633 (ruling that the district court erred in granting summary judgment on qualified immunity grounds where the record lacked sufficient evidence to show that an officer reasonably believed the plaintiff was

dangerous to herself or others); *Mizrahi v. City of New York*, No. 15-CV-6084, 2018 WL 3848917, at \*17 (E.D.N.Y. Aug. 13, 2018) ("Applying this doctrine here, qualified immunity is, at the outset, precluded by disputed issues of material fact. Even if those issues were resolved, however, the factual record before me is insufficiently developed to address the question of objective reasonableness."). The Court also notes that these disputes invoke questions of witness credibility, which it may not resolve at this stage. *See, e.g.*, *Kohutka v. Town of Hempstead*, 2 F. Supp. 3d 378, 382 (E.D.N.Y. 2014) (Spatt, *J*).

Based on the foregoing, the Court denies the summary judgment motion as to the first cause of action.

### ii.    The Second Cause of Action

The Court similarly rules as to the second cause of action, which is raised against Garro only. The second cause of action alleges that Garro authorized the transfer to Brunswick, even though the Plaintiff did not meet the § 9.37 criteria. That statute provides as follows:

> The director of a hospital, upon application by a director of community services or an examining physician duly designated by him or her, may receive and care for in such hospital as a patient any person who, in the opinion of the director of community services or the director's designee, has a mental illness for which immediate inpatient care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or herself or others.

N.Y. Mental Hyg. L. § 9.37(a). The statute "permits certain authorized physicians to have a person who may be of harm to himself committed to a medical facility for an evaluation." *Torres v. City of New York*, No. 16-CV-2632, 2018 WL 1737542, at \*8 (S.D.N.Y. Feb. 14, 2018).

As with the first cause of action, the parties present competing factual allegations. The parties do not dispute that upon the Plaintiff's arrival at Stony Brook, he was irritable and

guarded; that he refused to provide a urine sample; and that he denied having auditory or visual hallucinations..  However, they disagree as to whether Garro and Nurse Practitioner Morse jointly evaluated the Plaintiff on the following day; the length of Garro's evaluation; whether he made the above noted comments about using his firearms; and whether he suffered from persecutory delusions.

For the same reasons that the Court denied the summary judgment motion as to the first cause of action, it also declines to do so here.  The parties raise genuine disputes of material fact as to whether the Plaintiff was a danger to himself or others.  In addition, these disputes implicate issues of credibility, which the Court may not address at this stage of the litigation.

### 3.  As to the Sixth Cause of Action

The Court need not rule on the State Defendants' supplemental jurisdiction argument because the Court has already held that the § 1983 claims should proceed.  In any event, the Court has supplemental jurisdiction over the medical malpractice claim because it arises out of the same common nucleus of operative fact as the § 1983 claims.  *See Carnegie-Mellon Univ. v. Cahill*, 484 U.S. 343, 349, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988).  The Court reached this conclusion at an earlier stage of the litigation, *Bryant v. Steele,* 25 F. Supp. 3d 233, 248 (E.D.N.Y. 2014) (Spatt, *J.*), and thus, that ruling is the law of the case, *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2000).

"'To establish a claim for medical malpractice under New York law, a plaintiff must prove (1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused the plaintiff's injuries.'"  *Lettman v. United States*, No 12-CV-6696, 2013 WL 4618301, at *3 (S.D.N.Y. Aug. 29, 2018) (quoting *Arkin v. Gittleson*, 32 F.3d 658, 664 (2d Cir. 1994)).  Under New York law, "it is incumbent upon the plaintiff to present expert

22

testimony in support of his allegations to establish a pima facie case of malpractice." *Sitts v. United States*, 811 F.2d 736, 739 (2d Cir. 1987) (citations omitted); *see Shields v. United States*, 446 F. App'x 325, 326 (2d Cir. 2011) (summary order) (same).

The Plaintiff's medical malpractice claim revolves around Garro's brief examination of the Plaintiff, which constituted a departure from accepted standards of care by preventing Garro from making an informed decision about his dangerousness, which led to his confinement. He offers an affidavit from his expert, Selig. ECF 191.

In the affidavit, Selig makes sworn statements that determining a person's dangerousness requires, "first and foremost," a face-to-face evaluation by a psychiatrist, in order to learn what the patient is thinking, and to establish a rapport with the person, and to learn of his risk and mitigating factors. *Id.* at 191–92. He also says that while clinical standards permit a psychiatrist to gather information about a person from collateral sources, they "do not permit a psychiatrist to simply rely on information obtained from collateral sources without speaking to the patient." *Id.* at 191.

As to Garro, Selig says that she did not have a reasonable basis to conclude that the Plaintiff posed a substantial threat of physical harm to others. *Id.* at 8. Selig reasons that: (1) the Plaintiff testified that his meeting with Garro lasted no longer than five minutes; (2) it is impossible in that time frame for a psychiatrist to gather the information needed to make an informed assessment that comports professional standards; (3) those standards required Garro to corroborate the information in the MCT records about the Plaintiff's threatened use of firearms, and the Plaintiff testified that Garro never asked about these statements; (4) beyond the evaluation, the Plaintiff's statements do not evince the conclusion that he posed a danger to himself or others; (5) having a nurse practitioner meet with a patient first may lessen the time

that a psychiatrist would need to speak with a patient, the psychiatrist would still need more than five minutes to meet professional standards; and (6) "[i]n sum, the actions of Dr. Garro amounted [to] a substantial departure from accepted clinical standards that rendered unreasonable the conclusion that Mr. Bryant posed a substantial threat of harm." *Id.* at 8–10.

The Court notes that in response, the State Defendants cannot state with certainty as to how long Garro examined the Plaintiff. They also offer no substantiation as to whether Garro could have reached an informed decision based on an interview that lasted only between three and five minutes.

Here, the Plaintiff has cleared some of the hurdles that had felled other medical malpractice plaintiffs at the summary judgment stage. First, he has presented the testimony of an expert to substantiate his claim, an expert whose qualifications the State Defendants do not challenge *See Urena v. Yan Wolfson, M.D.*, No. 09-CV-01107, 2012 WL 958529, at *5–6 (E.D.N.Y. Mar. 20, 2012). His expert has identified the requisite standard of care. *See Schoolcraft v. City of New York*, 103 F. Supp. 3d 465, 535 (S.D.N.Y. 2015) (noting that courts have "dismissed medical malpractice claims on summary judgment where the plaintiff's expert fails to identify the standard of care which was allegedly violated"). Further, the expert said that Garro's actions marked a substantial departure from the accepted standard of care. *Bender v. Lowe*, No 08-CV-0334, 2011 WL 4001147, at *9 (S.D.N.Y. Aug. 31, 2011) *aff'd*, 531 F. App'x 142 (2d Cir. 2013) (summary order); *but see Algarin v. N.Y.C. Dep't of Corr.*, 460 F. Supp. 2d 469, 477 (S.D.N.Y. 2006) ("An anecdotal account of one expert's experience, however extensive or impressive the numbers it encompasses, does not by itself equate to a methodology, let alone one generally accepted by the scientific community.") (internal quotations and citations omitted), *aff'd*, 267 F. App'x 24 (2d Cir. 2008) (summary order).

Here, a genuine dispute exists as to whether Garro substantially departed from accepted standards of care when she met with the Plaintiff for an unspecified period and determined under § 9.37 that the Plaintiff was a danger to himself or others. *Schoolcraft*, 103 F. Supp. 3d at 535–36. This dispute as to a substantial departure creates a question of fact for the jury to decide. *Id.; see also Brock v. City of New York*, No. 15-CV-1832, 2018 WL 3579099, at *11 (S.D.N.Y. July 25, 2018) (observing that expert report "contains numerous assertions that Defendant Doctors failed to compile the information necessary to determine whether an individual should be involuntarily committed").

For the foregoing reasons, the Court denies the State Defendants' summary judgment motion in its entirety.

## C. The Brunswick Defendants' Summary Judgment Motion

The Court now analyzes the Brunswick Defendants' summary judgment motion. Like with the motion filed by the State Defendants, the Court first examines the Plaintiff's § 1983 claims before proceeding to his state claims. For the reasons that follow, the Court grants the Brunswick Defendant's motion in its entirety and dismisses the action as to them.

### 1. The Third, Fourth, and Fifth Causes of Action

The Brunswick Defendants raise two arguments in support of their motion for summary judgment as to the § 1983 claims. ECF 181-3. They contend that the Court should dismiss the § 1983 claims because they, as employees of a private entity, are not state actors. *Id.* at 12–22. In the alternative, they assert that Iheanacho and Khan are entitled to qualified immunity. *Id.* at 23–24. They aver that both doctors relied on their own individual evaluation of the Plaintiff when rendering an opinion, and that they did not violate a clearly established status or constitutional right of which a reasonable person would have known. *Id.* at 25.

In opposition, the Plaintiff contends that questions of fact exist as to state action. ECF 193 at 14–17. He specifically claims that the Court had ruled at an earlier stage of the litigation that in the absence of a psychiatric evaluation, the Brunswick Defendants would have engaged in state action. *Id.* at 14–15. He also submits his own affidavit, where he makes sworn statements that he never interacted with Iheanacho or Khan. ECF 189. The Plaintiff also cites his own deposition testimony claiming that the doctors never examined him. ECF 192 at 15.

As to Selig, The Plaintiff contends that he lacks personal knowledge of whether the examinations at Brunswick occurred and that he was not asked by the Plaintiff to address that issue. *Id.* at 16. Selig's affidavit states that, during a deposition, he did say yes when asked if Iheanacho and Khan evaluated the Plaintiff. ECF 191 at 15. However, he says that now, he has "no opinion" on the issue, and he "assume[s] these physicians did not conduct face-to-face evaluations because Mr. Bryant has asked me to make this assumption and I understand it is proper to do so." *Id.* at 15–16.

Concerning qualified immunity, the Plaintiff argues that the absence of any face-to-face evaluation means that Iheanacho and Khan did not act in an objectively reasonable way. *Id.* at 31. He cites his own affidavit in support. *Id.*

In reply, the Brunswick Defendants contend that the Plaintiff's assertions about the examinations are incredible as a matter of law. ECF 195. They allege that both Iheanacho and Khan have submitted declarations setting forth in detail their personal interactions with the plaintiff. *Id.* at 7. They further allege that Selig's affidavit contradicts his deposition testimony, in violation of a well-settled rule that a party may not do so to create an issue of fact. *Id.* at 8. They allege that the language of Selig's affidavit suggests that he was recanting his earlier testimony against his better judgment. *Id.* The Brunswick Defendants further clam that the

26

Plaintiff's attorney applied the same tactic—denying a face-to-face examination—in a 2018 case before the Southern District of New York, and that the Court in that case ruled that the plaintiff failed to create a triable issue of fact. *Id.* at 8–9 (citing *Jackson v. Barden*, No. 12-Civ.-1069, 2018 WL 340014, at *16 (S.D.N.Y. Jan. 8, 2018).

Section 1983 allows for injured parties to take action against people acting under color of state law. *Fabrikant v. French*, 691 F.3d 193, 206 (2d Cir. 2012) (citing 42 U.S.C. § 1983). "'Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes state action.'" *Id.* (citing *Flagg v. Yonkers Sav. & Loan Ass'n*, 396 F.3d 178, 196 (2d Cir. 2005) (internal quotation marks omitted). Thus, the § 1983 plaintiff bears the burden of showing state action on the part of the defendant. *Tancredi v. Metro. Life Ins. Co.*, 316 F.3d 308, 312 (2d Cir. 2003); *see Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 n.2, 121 S. Ct. 924, 148 L. Ed. 2d 807 (2001) ("If a defendant's conduct satisfies the state-action requirement of the Fourteenth Amendment, the conduct also constitutes an action 'under color of state law' for § 1983 purposes.").

As to private entities, they act under state law for § 1983 purposes when "(1) the State compelled the conduct [the 'compulsion test'], (2) there is a sufficiently close nexus between the State and the private conduct [the 'close nexus test' or 'joint action test'], or (3) the private conduct consisted of activity that has traditionally been the exclusive prerogative of the State [the 'public function test']." *Hogan v. A.O. Fox Mem'l Hosp.*, 346 F. App'x 627, 629 (2d Cir. 2009) (summary order) (citing *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008)). "The fundamental question under each test is whether the private entity's

27

challenged actions are 'fairly attributable' to the state." *Fabrikant*, 691 F.3d at 207 (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 838, 102 S. Ct. 2764, 73 L. Ed. 2d 418 (1982)).

In 2015, the Court addressed the state action issue when the Brunswick Defendants attempted to dismiss the action. *Bryant v. Steele*, 93 F. Supp. 3d 80 (E.D.N.Y. 2015) ("*Bryant II*"). It summarized the case history of § 1983 claims against private hospitals and health care professionals, concluding that district courts in this Circuit had "found that none of the three tests for state action—'state compulsion,' 'public function,' and 'close nexus'—were satisfied." *Id.* at 90 (collecting cases). The Court examined multiple notable decisions on the matter, among them *Doe v. Rosenberg*, 996 F. Supp. 343 (S.D.N.Y. 1998), where the court ruled that private health care professionals and a private hospital did not engage in state action when they involuntarily committed Doe to a psychiatric ward of Columbia Presbyterial Medical Center, and held that none of the three tests for state action were satisfied. *Id.* at 87. The Court also noted that the Second Circuit affirmed this decision. *Id.* The Court further commented that in *McGugan v. Aldana-Bernier*, 752 F.3d 224, 230 (2d Cir. 2014), the Second Circuit declined to overrule *Rosenberg*, and, that following the Second Circuit's ruling, it denied the plaintiff's petition for a panel rehearing or a rehearing *en banc*. *Id.* at 88–89.

Also in *Bryant II*, the Plaintiff had relied on a case from this District, *Tewksbury v. Dowling*, 169 F Supp. 2d 103 (E.D.N.Y. 2001), in which the court had denied a summary judgment motion in a § 1983 claim against private physicians. *Id.* In *Tewksbury*, the court had held that "if the decision to commit Tewksbury was based purely on their own independent medical judgment, [the] Defendants would be correct that they are not state actors." 169 F. Supp. 2d at 109. However, the court in *Tewksbury* did find state action because (1) the private physician defendant had never examined the plaintiff, and (2) had committed the plaintiff solely

28

because of an examination by a state physician and the information he had obtained from a social

worker at the state hospital. *See id.; see also Doe v. Harrison*, 03-Civ.-3943, 2006 WL 2109433,

at *7 n.4 (S.D.N.Y. July 28, 2006) (noting that court could find state action if state could be

involved in making the medical decisions to involuntarily confine and treat Doe).

> Applying *Tewksbury*, the Court ruled as follows:

> In the Court's view, this case is similar to *Tewksbury*. According to the third
> amended complaint, the factual allegations of which the Court must take as true
> on this motion to dismiss, Drs. Iheanacho and Khan relied upon the assessment of
> Dr. Garro, a state actor, without conducting an independent medical examination.
> In this way, the Plaintiff characterizes the decision by Drs. Iheanacho and Khan to
> involuntarily commit him as a *fait accompli*.

*Bryant II*, 93 F. Supp. 3d at 90–91. The Court then examined a similar case in *Tewksbury*'s

aftermath; *Grogan v. Bloomberg Grove Volunteer Ambulance Corp.* 917 F. Supp. 2d 383

(S.D.N.Y. 2013). The Court noted that in that case:

> [a]t the summary judgment stage, the District Court dismissed the Section 1983
> claims, distinguishing *Tewksbury* on the basis that "[the] plaintiff in *Tewksbury*
> offered evidence that the private hospital had worked closely with state doctors
> and staff in doing so" whereas the plaintiff in *Grogan* "provided no such evidence
> of joint action between BGVAC and the state." 917 F. Supp. 2d at 289;
> *Goonewardena v. N. Shoe Long Island Jewish Health Sys.*, No 11-CV-2456
> (MKB)(LB), 2012 WL 7802351, at *8 n.10 (E.D.N.Y. Nov. 5, 2012); *Koulkina v.
> City of New York*, 559 F. Supp. 2d 300, 321 (S.D.N.Y. 2008).

*Id.* at 91 (parentheticals omitted). The Court further examined cases ruling that a plaintiff could

establish a close nexus between the state and a challenged action upon showing that the state

"has provided such significant encouragement, either overt or covert, that the choice *must in law

be deemed to be that of the State.*" *Id.* at 92 (quoting *United States v. Stein*, 541 F.3d 130, 146–

47 (2d Cir. 2008) (internal quotation marks omitted).

> Ultimately, the Court held that it "need not decide whether a private actor's decision to

follow the recommendation of a state actor, without an agreement between them, can be

29

attributable to the State." *Id.* The Court elaborated that "[t]his is in part, because, as in *Tewksbury*, Drs. Iheanacho and Khan could not have committed the Plaintiff without the assistance of Dr. Garro, who is unquestionably a state actor." *Id.*

Here, the Brunswick Defendants submit *Rosenberg* for the premise that an involuntary commitment pursuant to state Mental Hygiene Law does not constitute state action sufficient to entertain federal jurisdiction. ECF 181-3 at 15–17. They argue that although *Rosenberg* and *McGugan* analyzed different sections of the Mental Hygiene Law, §§ 9.27 and 9.39, respectfully, from the one at issue in this case, § 9.37, all three statutes contain the same language that require an act of professional medical judgment in order to involuntarily commit a person. *Id.* at 18. They further contend that Iheanacho did not decide to admit the Plaintiff until after performing an individual examination and evaluation, and that Khan acted in the same way with his 72-hour examination, making them not state actors. *Id.* at 20. They also seek to distinguish the case from *Tewksbury*, asserting that in that case, the court had commented that had the defendants committed the plaintiff based on their own medical judgment, they would not be state actors. *Id.*

As part of this differentiation effort, the Brunswick Defendants rely on a 2016 decision from this District that ruled that the decision to admit a patient to a private hospital was based solely on the determination of a physician at that hospital, relieving the hospital from being considered a state actor. *Id.* at 21 (citing *Kenny v. Nassau Univ. Med. Ctr.*, No. 14-CV-7505, 2016 WL 1056999 (E.D.N.Y. Mar. 14, 2016). The Brunswick Defendants also contend that now, upon the completion of discovery, they have shown that both Iheanacho and Khan had independently examined the Plaintiff. *Id.* As to the Plaintiff's allegations to the contrary, they say the record establishes this claim is false, based on: (a) Iheanacho's declaration; (b) testimony from Selig, the Plaintiff's expert, that both Khan and Iheanacho examined the Plaintiff; (c) the

medical records from Brunswick; and (d) testimony from their expert. *Id.* at 22; ECF 181-8. They also assert that the Plaintiff failed in his third amended complaint to make any factual allegations that either Iheanacho or Khan were state actors. ECF 181-3. at 23.

The Court acknowledges that this case presents a complex state action issue that hinges on a simple issue of fact: whether or not Iheanacho and Khan examined the Plaintiff.  Both parties present evidence that point in opposing directions.

Unlike the case of the State Defendants summary judgment motion, the Plaintiff no longer has the sworn statements of his expert supporting his claims, a statement from an SCPD officer that casts doubt on the Defendants' argument; or multiple statements from the State Defendants that served to isolate a contested issue of fact.  There is also the issue of the Plaintiff's counterstatement, where at one point he implies that the Iheanacho examination did take place. ECF 187 at 21.

Conversely, the Brunswick Defendants buttress their arguments with not only their statements but with copious medical records.  This brings the case more in line with the established practice by this Court and others to grant summary judgment where the only basis for a genuine dispute of material fact is the Plaintiff's self-serving testimony. *See Clark*, 2020 WL 473616, at *9 ("As for the hypothetical neighbors conjured by the Plaintiff, he fails to provide corroborating testimony from these neighbors or any documentation illustrating the truthfulness of his description."); *Pressley*, 2016 WL 1271480, at *3; *Petrisch v. HSBC Bank USA, Inc.*, No, 07-CV-3303, 2013 WL 1316712, at *10 (E.D.N.Y. Mar. 28, 2013).

In the absence of the Plaintiff's self-serving testimony, the Court holds that there are no genuine disputes as to whether the Brunswick Defendants performed their own examinations of the Plaintiff, and that they made their decision to confine the Plaintiff at Brunswick based on

those examinations.  Having examined the Plaintiff, the Brunswick Defendants are not state actors, thus eliminating a necessary condition to being sued under § 1983.  *See McGugan*, 752 F.3d at 230; *Tewksbury*, 169 F. Supp. 2d at 109.

The same self-serving affidavit is the only support for the Plaintiff's claim on qualified immunity, and the Court also declines to credit it for that purpose.  The Court also holds alternatively that even if they are deemed state actors, that Iheanacho and Khan are entitled to qualified immunity, because the evidence before the Court shows that they acted reasonably in their examinations of the Plaintiff, and because the Plaintiff presents no evidence that they knowingly violated the law.  *See Estate of Keenan v. Hoffman-Rosenfeld*, No. 16-CV-0149, 2019 WL 3410006, at *21 (E.D.N.Y. July 29, 2019) ("Even if the Court were to find the Northwell Defendants were state actors, qualified immunity would shield them from § 1983 liability."); *Sullivan v. City of New York, No.* 14-CV-1334, 2015 WL 5025296, at *8 (S.D.N.Y. Aug. 25, 2015) (applying qualified immunity to employee of non-profit organization retained by New York City to interview arrestees).  Accordingly, the Court grants the Brunswick Defendants' motion for summary judgment as to the third, fourth, and fifth causes of action.

## 2.  The Seventh and Eighth Causes of Action

The Brunswick Defendants also move for summary judgment as to the medical malpractice claims raised against them.  ECF 181-3.  They first argue that, if the Court dismisses the § 1983 claims, that it should also dismiss the medical malpractice claims for lack of supplemental jurisdiction.  *Id.* at 25–27.  They also argue that the Court should grant them summary judgment on the merits, because (1) the only medical malpractice claim against Iheanacho, Khan, and Brunswick is that they never evaluated the Plaintiff; and (2) it has been clearly shown that those evaluations occurred.  *Id.* at 27–28.

In support, they submit an expert declaration from Dr. Frank Dowling ("Dowling").   In that declaration, Dowling says that Iheanacho and Khan acted in accordance with accepted standards in deciding to further hospitalize the Plaintiff.   *Id.* at 28–29.   They also submit Iheanacho's declaration, in which he reveals the information he received from his examination of the Plaintiff.  *Id.* at 29.

In opposition, the Plaintiff only raises arguments that the Court has supplemental jurisdiction over the medical malpractice claims.   ECF 192 at 30.   He does not raise any arguments as to the merits of those claims.   *Id.*   He does submit the affidavit of Selig, who says that Iheanacho and Khan could not have satisfied clinical standards if they never examined the Plaintiff, and even if they had, that it would be unreasonable to conclude that the Plaintiff posed a substantial threat of harm to himself or others. ECF 191 at 11. In reply, the Brunswick Defendants reiterate their earlier position about the Plaintiff's claims being incredible as a matter of law. ECF 195.

As with the State Defendants, the Court has already held that the medical malpractice claim arise out of the same common nucleus of operative fact as the Plaintiff's § 1983 claims against the Brunswick Defendants. *Bryant II*, 25 F. Supp. 3d at 245.  That decision is the law of the case, and the Court thus retains supplemental jurisdiction over those claims.

However, those claims fail on the merits.  As noted above, the Court has declined to credit the Plaintiff's self-serving affidavit as to whether Iheanacho and Khan examined him. Further, Selig, the Plaintiff's expert, expressly presents no opinion as to whether that examination took place either.  That the examinations occurred eliminates the bases for both the seventh cause of action—concluding that the Plaintiff was dangerous in the *absence of an*

*evaluation*—and the eighth cause of action—subjecting the Plaintiff to treatment by someone other than a psychiatrist.

The only argument brought forward by the Plaintiff at this stage of the litigation comes from Selig's affidavit, where Selig contends that even if the examinations occurred, the Brunswick Defendants would have no basis for concluding that the Plaintiff was dangerous. This argument would constitute a new claim, which a litigant may not raise for the first time in opposition to a motion for summary judgment. *See Mediavilla*, 259 F. Supp. at 106 (citing *Avillan v. Donahoe*, 483 F. App'x 637, 639 (2d Cir. 2012) (summary order)). Accordingly, the Court grants the summary judgment motion with regard to the medical malpractice claims.

### 3. The Ninth Cause of Action

As to the ninth and final cause of action, the Brunswick Defendants contend that the Court should dismiss the claim against Brunswick if it dismisses the other substantive claims, because "there is no basis to otherwise hold it responsible." ECF 181-3 at 29. The Plaintiff makes no argument about this claim in his opposition.

The Court grants the summary judgment motion as to the medical bills claim on grounds of abandonment. A party abandons a claim in the context of a summary judgment motion when she does not respond to arguments concerning that claim. *Vetrano v. Miller Place Union Free Sch. Dist.*, 369 F. Supp. 3d 462, 470 (E.D.N.Y. 2019) (Spatt, *J.*); *Williams v. Suffolk Cty.*, 284 F. Supp. 3d 275, 284 (E.D.N.Y. 2018) (Spatt, *J.*) ("The Plaintiff did not respond, in any way, to the Defendants' arguments concerning his malicious prosecution claim. Therefore, that claim is deemed abandoned."); *Sherman v. Cty. of Suffolk*, 71 F. Supp. 3d 332, 355 (E.D.N.Y. 2014).

Accordingly, the Court grant the Brunswick Defendants' summary judgment motion in its entirety.

34

## III.    CONCLUSION

For the foregoing reasons, the Court denies the State Defendants' Rule 56 motion, and grants the Brunswick Defendants' Rule 56 motion.    The Court dismisses the action as to Defendants Iheanacho, Khan, and Brunswick.


It is **SO ORDERED.**



/s/ Arthur D. Spatt

_____          _____May 22, 2020_____

              Arthur D. Spatt, U.S.D.J.                                    Date